UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

FRANK DiMATTINA,

                    Petitioner,

       -against-                                   13 CV _____

UNITED STATES OF AMERICA,

                    Respondent.

-------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF FRANK DiMATTINA'S**
**MOTION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2255**

JEFFREY LICHTMAN, ESQ.
Law Offices of Jeffrey Lichtman
750 Lexington Avenue, 15th Fl.
New York, New York 10022
Ph:  (212) 581-1001
Fax: (212) 581-4999
*Attorney for Petitioner Frank DiMattina*

## PRELIMINARY STATEMENT

Frank DiMattina submits this memorandum of law in support of his motion for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255. The petitioner's application is predicated on the ineffectiveness of trial counsel due to his failure to set forth an alibi defense. The petitioner's motion for a bill of particulars – which included requests for the exact dates of the Hobbs Act Extortion and related § 924(c) offenses charged – was denied. Nevertheless, the exact date of the extortion was only initially revealed by two government witnesses on the second day of a three day trial – yet no attempt was made to investigate and prepare an alibi defense at this very late time, or even to request an adjournment. The trial was completed the next day and petitioner was convicted only of the Hobbs Act Extortion (Count Two) and related gun charge (Count Three).

With this submission, the petitioner proves clearly that he could not have been able to commit the crimes for which he was convicted: 12 witnesses say that he was in another state at the time the crime was allegedly committed; six additional witnesses report that he was not seen at the catering hall on the date the alleged extortion – and one witness worked as a valet in the parking lot, the precise location of the supposed extortion. As this investigation was a significant undertaking, it took a matter of weeks for this information to be gathered and prepared by the petitioner and his replacement counsel. Nonetheless, it is clear that Mr. DiMattina is actually innocent of the crimes for which he was convicted – and that his trial counsel's deficient performance has caused this unreliable outcome.

**STATEMENT OF FACTS**

A review of the chronology of the government's disclosures which shed light on the date of the alleged extortion concerning the St. Joseph's By the Sea School Lunch Program contract makes clear that no fixed date was ever provided prior to the trial.

The Complaint and Indictment

On September 15, 2011, the Complaint in this case was filed charging Mr. DiMattina with the extortion of Walter Bowers in connection with the School Lunch Program contract as well as the related weapons charge – these crimes were charged with having occurred "in or about and between June 1, 2010 and September 1, 2010." Complaint at p. 1-2. The language in the Complaint does not narrow down this broad three month period of time, suggesting instead that the criminal behavior occurred sometime during the "summer of 2010." Id. at 3-4.

Less than a month later, on October 13, 2011, the Indictment was filed and, like the Complaint, alleged all criminal activity pertaining to the School Lunch Program contract to have occurred between June 1, 2010 and September 1, 2010. Indictment at ¶¶ 1-3.

Rule 16 Materials

The only materials disclosed by the government which could have possibly shed some light on the timing of the alleged extortion of Bowers in connection with the School Lunch Program contract was the actual written bid submitted by Bowers to St. Joseph by the Sea High School – the obvious presumption being that the extortion did not occur until after Bowers submitted his bid, thereby triggering the alleged extortion. This document, however, was undated and provided no guidance at all as to the exact date of the alleged extortion. See Lunch Program Bid of Ariana's of Staten Island, attached as Exhibit A.

2

Motion for a Bill of Particulars – and Decision

On October 25, 2011, counsel for Mr. DiMattina moved for a bill of particulars for, amongst other things, the timing of the "school lunch allegations" which were alleged to have occurred within "a time frame spanning three months." October 25, 2011 Memorandum of Law in Support of Defendant's Motion for a Bill of Particulars at p. 6, attached as Exhibit B. On November 30, 2011, the Court denied this motion. November 30, 2011 Hearing at T 3, attached as Exhibit C. The request for particulars was again brought up orally during a hearing on December 20, 2011 – and again the Court denied the request noting that "[t]here is no need for it. I think we have enough specificity ...." December 20, 2011 Hearing at T 5, attached as Exhibit D.

§ 3500 Material

Just days before the trial, the government had still not provided any particulars regarding the timing of the alleged extortion by Mr. DiMattina of Walter Bowers regarding the School Lunch Program contract. The § 3500 material included just the following potentially relevant materials as to the timing of the alleged extortion of Bowers, information included which was completely inconsistent on the extortion timing issue:

- FBI FD-302 Report Dated July 28, 2011 and August 11, 2011: Bowers indicated to agents that after receiving a call on a Saturday morning from DiMattina, Bowers "had a walk and talk with DIMATTINA **in approximately July or August of 2010** ..." wherein DiMattina threatened him with a gun over the bid Bowers had placed on the School Lunch Program contract.

FBI FD-302 Report Dated July 28, 2011 and August 11, 2011 at pp. 2-3, attached as Exhibit E (emphasis supplied).

3

- <u>September 15, 2011 Grand Jury Testimony of Walter Bowers</u>: Bowers testified that he put in his bid for the lunch program in "**June or July. It was June** because Monseigneur said 'We have to have this wrapped up by July 4th because school is shutting down, and you need at least two months to get all the paperwork together.'"

September 15, 2011 Grand Jury Testimony of Walter Bowers at T 19, attached as Exhibit F (emphasis supplied).

As shown, up to the trial the defendant had <u>not</u> been given clear notice of the date of the alleged extortion relating to the School Lunch Program contract; any information provided by the government on this issue was muddled at best.[1] Despite the best efforts of Mr. DiMattina and his trial counsel, the government simply did not provide an exact date for the extortion – thereby making it impossible to identify, prepare and present a possible alibi for that date.

<u>The Trial Testimony</u>

Petitioner DiMattina's trial began <u>less than three months after he was indicted</u>, leaving little time for a defense investigation. As for Bowers, just months after he was debriefed by the FBI and testified in the grand jury – and provided inconsistent and vague timing for the crime – his recollection suddenly sharpened during his direct examination at on the second day of trial, January 4, 2012:

> Q:   After you submitted the bid to St. Joseph's, what is the next thing that happened with this?
>
> A:   On a Saturday, I think the date was the last week in June .... Frank stopped by ....  Frank, he looked at me, picked up his shirt.  He had a gun in his shirt, in his pants, his trousers,

---

[1] This contradicts the government's contention at sentencing that although "[t]he date [of the extortion] was never established, ... it was always disclosed that it was a Saturday in the summer prior to the 4th of July weekend." March 30, 2012 Sentencing at T 9.

4

and he said to me: I'm telling you, you better pull out of the
bid or there's going to be problems.

T 108-110.  Later in his examination, Bowers was asked again if he remembered the date of "the

incident about this gun ..."  Despite previously being unable to narrow the date of the extortion to

even a single month during the summer of 2010, Bowers responded: "Approximately probably

the 25th of June, I think it was a Saturday – it was a Saturday."  T 166.  Bowers further testified

that the following Monday after the threat he visited Father Reilly from St. Joseph by the Sea

High School and "pull[ed] out of the bid" because he was "100 percent" afraid.  T 119.

Father Reilly testified that same day, immediately after Bowers, and confirmed

that Bowers came to see him that Monday during the last week in June, 2010 (June 28), to

withdraw his bid.  T 208-09.

The very next day, January 5, 2012, the parties summed up, the jury was charged and

deliberations began; on January 6, 2012, the petitioner was convicted of the Hobbs Act Extortion

(Count Two) and the related § 924 (c) charge (Count Three).

Petitioner's Instructions to His Trial Counsel

As noted in his Affidavit of March 16, 2012, following his arrest, Petitioner DiMattina

requested that his trial attorney seek the "specific date of when [he] was accused of extorting Mr.

Bowers."  DiMattina March 16, 2012 Affidavit at ¶ 20.[2]  Trial counsel had informed him that the

government had provided no specific date; that based on the Complaint and Indictment, the

---

[2] Petitioner's March 16, 2012 Affidavit was submitted with his March 16, 2012 Rule 33
Motion, which, together with all of the affidavits annexed thereto, is fully incorporated herein by
reference.

extortion was alleged to have occurred "sometime between June 1, 2010 and September 1, 2010

...." Id. The summer of 2010 was a busy time for Mr. DiMattina because, as he explained, he

> work[ed] every weekend and spen[t] most if not the rest of the time
> away with [his] wife and children at Atlantic City. [He] also rented
> a house with a number of other families in August 2010 at the
> Jersey shore (Lavallette, New Jersey). [He] also [knew] that [his]
> wife and [he] went to Aruba that summer celebrating [their]
> wedding anniversary.

Id. As such, trial counsel made a motion for a bill of particulars which included a request for the

exact date of the extortion. After the motion was denied by the Court on November 30, 2011

(Ex. C at T 3) defense counsel again pressed the matter on December 20, 2011 and again the

motion was denied. Ex. D at T 5.

When the exact date of the purported extortion of Bowers was revealed on day two of the

three day trial, petitioner DiMattina makes clear that while he believed that he must have been

working that Saturday 19 months earlier and, therefore, potentially had an alibi, he felt powerless

in the midst of a quick, short trial to even begin to retrace his long ago steps and attempt to

investigate something which ultimately required weeks to accomplish. March 11, 2013 Affidavit

of Frank DiMattina, at ¶ 4.

The Efforts to Determine Whether an Alibi Existed – And the Results

Following his conviction in early January 2012, petitioner hired new counsel and began

researching and retracing his precise actions on "the last Saturday in June" of 2010, the date

Walter Bowers claimed he was extorted by Mr. DiMattina. T 108-110, 166. As noted in Mr.

DiMattina's March 16, 2012 Affidavit, he first checked his business records to learn that he had

multiple events at his Woodbridge, New Jersey catering hall, Ariana's Grand, on that date, June

6

26, 2010. March 16, 2012 Aff. at ¶ 6. This was a memorable day for Mr. DiMattina as two of

the events were parts of a Pakistani or Indian wedding and another was a formal for St. John's

University (Staten Island campus) of which many of his employees attended. Id. Mr. DiMattina

maintains that he was at Ariana's Grand in Woodbridge that entire day and night and was never

present at Ariana's in Staten Island – the location of Bowers' supposed extortion. Id. at ¶ 5.

Business records were reviewed to determine who was working during that day at

Ariana's Grand and numerous employees were interviewed as to what they remembered from

those various events. Id. at ¶ 6. Beyond Mr. DiMattina's own employees, he spoke with guests

of these events, clients, vendors and others who may have been at Ariana's Grand in

Woodbridge, New Jersey on June 26, 2010. See id. at ¶ 10.

Mr. DiMattina similarly sought out individuals who were present at Mr. Bowers' catering

hall, Ariana's of Staten Island, on June 26, 2010 to demonstrate that he was not seen by anyone

present that day at the location of the alleged extortion. Id. at ¶¶ 18-19. While certainly proving

this negative does not in and of itself establish an alibi it certainly corroborates the witnesses who

claim to have seen Mr. DiMattina at his Woodbridge, New Jersey catering hall that entire day. In

addition, now that the government and Mr. Bowers have had notice of this asserted alibi for

nearly a year, it is presumed that at least some effort has been made by the government to locate

any individuals who can undermine the alibi. None can be found because they simply do not

exist.

Regardless, the investigation and establishment of Mr. DiMattina's alibi took weeks to

complete. Eventually, 15 affidavits were provided to the Court in support of the aborted Rule 33

application made in March of last year. A review of these affidavits and corroborating records

7

makes clear that Mr. DiMattina could not have been at Walter Bowers' catering hall on June 26, 2010 – since he was in New Jersey at his own hall for the entire day and into the next morning, June 27.  Id. at ¶ 5.

Of the 15 witnesses who provided affidavits for Mr. DiMattina's March 16, 2012 Rule 33 Motion, 10 of them were at Mr. DiMattina's catering hall, Ariana's Grand, in Woodbridge, New Jersey on June 26, 2010 and saw him throughout the day and night.  This list includes Mr. DiMattina's employees, guests at events which took place that day, and others:

Joseph Barrile: The General Manager of Ariana's Grand in Woodbridge, New Jersey, reported that after refreshing his memory by reviewing the business' records, he recalled that Mr. DiMattina was present at Ariana's Grand when he arrived at approximately 9:30 a.m. on June 26, 2010.  March 10, 2012 Affidavit of Joseph Barrile at ¶¶ 2-4.  Amongst some specific memories of Mr. DiMattina's actions, Mr. Barrile recalled that the petitioner helped cook in the kitchen that afternoon; in addition, Ariana's Grand had three events planned for that day and night – at which Mr. DiMattina was present.  Id. at ¶¶ 3, 7-9.

Matthew Forgione: A student at St. John's in Staten Island, Mr. Forgione was responsible for paying for his fraternity's annual formal at Ariana's Grand in Woodbridge, New Jersey on June 26, 2010.  March 11, 2012 Affidavit of Matthew Forgione at ¶ 3.  He met with Mr. DiMattina and Joseph Barrile, the General Manager of Ariana's Grand, at about 2:30 or 3:00 p.m. that day to make the final $4,800 payment owed.  Id. at ¶ 4.  Later that evening, Mr. Forgione saw Mr. DiMattina at his fraternity's party inside Ariana's Grand.  Id. at ¶ 5.

Peter Basilio: An employee of his father's bakery, La Dolce Pastry Shoppe, Mr. Basilio checked his business records and located two receipts (attached to his affidavit) for deliveries

made on June 25 and June 26, 2010. March 11, 2012 Affidavit of Peter Basilio at ¶ 3. As

explained in his affidavit, both of these deliveries were paid by Mr. DiMattina to Mr. Basilio on

June 26, 2010 at Ariana's Grand as noted by Mr. DiMattina's initials on the receipts. Id. While

Mr. Basilio had no recollection of the approximate time of his delivery on June 26, 2010, based

on the distance from Ariana's Grand to his bakery he believed it must have occurred between

11:00 a.m. and noon that day. Id. at ¶ 4.

Anthony Mungo: On June 27, 2010, Mr. Mungo hosted a Christening party for his

daughter at Ariana's Grand in Woodbridge. March 10, 2012 Affidavit of Anthony Mungo at ¶ 2.

However, as corroborated by the receipt attached to his affidavit, the day before, on June 26, he

dropped off a large cake, candles and some party favors at Ariana's Grand. Id. at ¶¶ 3-4. While

Mr. Mungo did not recall the exact time he met with Mr. DiMattina that morning at Ariana's

Grand in order to drop off the cake and other objects, he believed it was "approximately 10:30

AM, perhaps as late as 11AM but certainly not later than that ... [as he] saw all of the employees

setting up for a very large event." Id. at ¶ 5. In addition, Mr. Mungo went over seating charts

with Mr. DiMattina that morning. Id. at ¶ 6.

Eric Frigiano: The weekend Maitre'd at Ariana's Grand, Mr. Frigiano remembered the

"Indian wedding" that day which was comprised of actually a "separate party that evening."

March 13, 2012 Affidavit of Eric Frigiano at ¶ 3. He "also remember[ed] that on the same day as

the Indian party was the annual St. John's fraternity party at Ariana's Grand." Id. Upon his

arrival at 10:00 a.m. that day, Mr. Frigiano noted that Mr. DiMattina was already present and

inside the hall's kitchen; he recalled seeing Mr. DiMattina "throughout the day and night ..." Id.

at ¶ 5. Finally, Mr. Frigiano recalled the "serious problem with the [v]alet staff" from that day

wherein the staff started improperly charging a $5 fee for parking.  Id. at ¶ 7.  Mr. DiMattina was

informed by Mr. Frigiano of the situation and then left the kitchen and spoke to the valets himself

at a few minutes past 6:00 p.m. that day.  Id. at ¶¶ 7-8.

      Michael Falletta: Mr. Falletta has managed valet services at Ariana's Grand in

Woodbridge since December 2009 and presently maintains valet records for that catering hall.

March 11, 2012 Affidavit of Michael Falletta at ¶¶ 2-3.  As such, he pulled the valet staff

schedule for June 26, 2010 and included it with his affidavit.  Id. at ¶ 4.  He recalled that day as

he attended his fraternity's formal that night at Ariana's Grand – but had gotten lost on his way to

the nearby hotel he was to be staying at and stopped by Ariana's Grand "mid-day" to get

directions and see some friends.  Id. at ¶ 8.  While there he saw Mr. DiMattina, Joe Barrile and

Matt Forgione, who had just paid the bill for the fraternity party.  Id.  Mr. Falletta also recalled an

incident at Ariana's Grand that day in which the valet staff improperly attempted to charge guests

a $5 fee; when he arrived back at Ariana's that night he spoke to Mr. DiMattina about this issue

and saw him later that night during the fraternity party.  Id. at ¶ 9.

      Edmund Rivers: In June 2010, Rivers worked parking cars for Mike Falletta who

provided valet services for Ariana's Grand in Woodbridge.  March 11, 2012 Affidavit of

Edmund Rivers at ¶ 3.  Rivers reported in his affidavit that Mr. DiMattina was present when he

began his shift at about 12:15 or 12:30 p.m. on June 26, 2010.  Id. at ¶ 5.  He remembered that

day because he worked both the afternoon and evening shifts parking cars (business records

attached to his affidavit support this) and charged a $5 parking fee to guests who had arrived

after 4:00 p.m. – because he had not been tipped during his earlier shift.  Id. at ¶ 4.  Soon

thereafter, Rivers recalled that "Mr. DiMattina came out to yell at us about this problem ...."  Id.

    Ilya Goussev: Mr. Goussev, a student at St. John's University in Staten Island, also worked as a valet for Mike Falletta during the summer of 2010 as evidenced by the business record attached to his affidavit.  March 11, 2012 Affidavit of Ilya Goussev at ¶¶ 2-3.  On June 26, 2010 Goussev worked the late shift at Ariana's Grand in Woodbridge, New Jersey and recalled the fraternity formal and the "Indian wedding" which occurred that day. Id. at ¶ 4.  He also remembered the incident when the valets decided to charge $5 for parking and Mr. DiMattina came out "shortly after[]" 3:30 to 4:00 p.m. to yell at the valets about this issue.  Id. at ¶ 6.  Finally, Mr. Goussev recalled checking in at Ariana's Grand and seeing Mr. DiMattina that day from at least 2:30 to 3:00 p.m. as well as that night during the St. John's party.  Id. at ¶ 7.

    Nizat Kaiyoum and Ambika D. Carew: This couple visited Ariana's Grand in Woodbridge and met with Mr. DiMattina for a tour of the facility on June 26, 2010 in order to determine whether they wished to have their wedding at the hall.  March 15, 2012 Affidavit of Nizat Kaiyoum and Ambika D. Carew at ¶¶ 3, 6.  They recalled arriving prior to the Indian party which occurred later that day and before the valets arrived for work; they left right as a few guests began arriving along with some of the valet staff.  Id. at ¶¶ 4, 6.  They estimate their time with Mr. DiMattina at Ariana's Grand to have been from 11:00 a.m. until 12:15 p.m. that day. Id. at ¶ 7.

    Another five witnesses submitted affidavits with the March 16, 2012 Rule 33 Motion who were present at Mr. Bowers' catering hall – Ariana's of Staten Island – on June 26, 2010.  Their affidavits corroborate Mr. DiMattina's alibi that he was not present at that location that day and, therefore, could not possibly have threatened Bowers:

11

Anthony Scarlotta: A bartender at Ariana's of Staten Island, Mr. Scarlotta claimed to have worked "virtually every weekend" during the "Spring and Summer months" in 2010. March 10, 2012 Affidavit of Anthony Scarlotta at ¶ 3. In his affidavit, he emphatically stated that he was "confident that [he] was at Ariana's of Staten Island between 11AM and 11:30 AM" on Saturday, June 26, 2010. Id. Additionally, he reported that he never saw Mr. DiMattina at Ariana's of Staten Island after it was sold to Mr. Bowers, months before. Id. at ¶ 4.

John Gorgoglione: A Local 3 electrician apprentice, Mr. Gorgoglione worked as a valet parking cars at Ariana's of Staten Island on June 26, 2010 during the early shift (which he confirmed upon reviewing Mike Falletta's business records for that day). March 11, 2012 Affidavit of John Gorgoglione at ¶¶ 2-3. In his affidavit, Mr. Gorgoglione reported that he arrived to work at about noon that day and parked cars for "the duration of the party, approximately 5 and ½ hours ...." Id. at ¶ 4. While he took bathroom and food breaks that day, he "never left the front of the lot (adjacent to the catering hall) except to park cars" from noon until about 1:30 p.m. Id. At no point did he see Mr. DiMattina that day and there was apparently no report that any of the valets saw Mr. DiMattina either. Id. at ¶¶ 4-5.

Geraldine Habeeb: Ms. Habeeb celebrated her daughter's bridal shower at Ariana's of Staten Island on June 26, 2010. March 11, 2012 Affidavit of Geraldine Habeeb at ¶ 3. She arrived at approximately 1:00 p.m. that day and although she looked for Mr. DiMattina (Ms. Habeeb incorrectly believed that Mr. DiMattina still owned that location at that time), did not see him the entire day. Id. at ¶¶ 4-5. She left at approximately 5:30 to 6:00 p.m. Id. at ¶ 6. Upon speaking to Debra Martin, Mr. DiMattina's former assistant, she also learned that he would be not be available the entire day as he was in New Jersey. Id. at ¶ 5.

Victoria Wall: Ms. Habeeb's daughter, Victoria Wall arrived at Ariana's of Staten Island on June 26, 2010 at approximately noon; she did not see Mr. DiMattina the entire day -- and left at approximately 5:30 p.m. March 11, 2012 Affidavit of Victoria Wall at ¶¶ 2, 4, 6.

Maryanne Honadel: Ms. Honadel booked and attended a baby shower at Ariana's of Staten Island on June 26, 2010, arriving at approximately noon or 12:15 p.m. and staying until about 5:30 p.m. March 10, 2012 Affidavit of Maryanne Honadel at ¶¶ 4, 6. Although she booked the party with Mr. DiMattina, she learned that day from Debra Martin, his former assistant, that he would not be present that day as he was no longer the owner of Ariana's of Staten Island. Id. at ¶ 5. Ms. Honadel did not see Mr. DiMattina that entire day at Ariana's. Id. at ¶ 6.

Since the filing of the petitioner's March 16, 2012 Rule 33 Motion, further investigation into the events of June 26, 2010 has revealed two additional individuals who interacted with Mr. DiMattina on that date at Ariana's Grand in New Jersey and another who worked at Ariana's of Staten Island and did not see him at that location:

Vincent Purpura: Vincent Purpura traveled to Ariana's Grand in Woodbridge, New Jersey with his wife, Carmella, and daughter, Gabriella, on June 26, 2010 to personally meet with Mr. DiMattina, examine the event space, and leave a deposit for Gabriella Purpura's sweet sixteen party. See March 11, 2013 Affidavit of Vincent Purpura at ¶¶ 2-3, attached as Exhibit G. Mr. Purpura recalls having arrived at Ariana's Grand between approximately 2:00 p.m. and 3:00 p.m., meeting with Mr. DiMattina some 30 to 60 minutes later and providing a $1,000 deposit, the receipt for which was signed by both Mr. DiMattina and Mr. Purpura and is attached to his affidavit. Ex. G at ¶ 4.

13

Brianna Conte: Ms. Conte was employed as a waitress at Ariana's Grand in New Jersey and specifically recalls June 26, 2010 because of the large Indian party that day and the issue with the valet parking referenced by other witnesses.  March 9, 2013 Affidavit of Brianna Conte at ¶ 3, attached as Exhibit H.  On that date, Ms. Conte arrived to work at approximately 12:00 p.m., interacted with Mr. DiMattina shortly thereafter and then spoke with him later that day concerning the valet parking issue.  Id. at ¶ 4.

Graceanne Belmonte: Ms. Belmonte was employed as a waitress at Ariana's of Staten Island on June 26, 2010 – specifically recalling that date because a valet parking attendant at that location was caught drinking on the job that day and fired.  March 6, 2013 Affidavit of Graceanne Belmonte at ¶¶2, 4, attached as Exhibit I.  Though she arrived at work at approximately 11:00 a.m. and worked until after midnight, at no point did Ms. Belmonte see either Mr. DiMattina or Walter Bowers at Ariana's of Staten Island on that date.  Id. at ¶ 3.

***

While the government will surely argue that the affidavits, when taken as a whole, do not provide a complete alibi for Mr. DiMattina for every second of June 26, 2010, two points should be made: *First*, a significant number of people saw Mr. DiMattina at his Woodbridge, New Jersey catering hall for overlapping parts of the entire day of June 26, 2010, a busy Saturday at Ariana's Grand during the summer.  The notion that he could have left and made a quick trip to and from Staten Island from Woodbridge, New Jersey is not realistic considering the tremendous beach traffic which surely existed on that summer Saturday.  *Second*, had these 18 witnesses testified they would have shed a tremendous amount of doubt on the thin, barely corroborated testimony of two interested government witnesses.

14

## ARGUMENT

## PETITIONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BY TRIAL COUNSEL'S FAILURE TO CALL CRUCIAL WITNESSES TO TESTIFY

### i.    The Applicable Legal Standard

Under the Supreme Court's decision in <u>Strickland v. Washington</u>, an ineffective assistance claim requires that the Court review whether "counsel's representation fell below an objective standard of reasonableness," and, if so, whether there "is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." 466 U.S. 668, 688, 694 (1984); <u>see also</u> <u>United States v. Cohen</u>, 427 F.3d 164, 167 (2d Cir. 2005); <u>United States v. Gaskin</u>, 364 F.3d 438, 468 (2d Cir. 2004); <u>United States v. Cheng</u>, 250 F.3d 79, 84 (2d Cir. 2001). A "reasonable probability" is one "sufficient to undermine confidence in the outcome" of the trial. <u>Strickland</u>, 466 U.S. at 694; <u>Eze v. Senkowski</u>, 321 F.3d 110, 123 (2d Cir. 2003); <u>Aparicio v. Artuz</u>, 269 F.3d 78, 95 (2d Cir. 2001).

Under this test, courts should "carefully examine trial records in light of both the nature and seriousness of counsel's errors and their effect in the particular circumstances of the case." <u>Strickland</u>, 466 U.S. at 702. Further, the effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial. As <u>Strickland</u> states, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." <u>Id.</u> at 696; <u>see also</u> <u>United States v. Agurs</u>, 427 U.S. 97, 113 (1976) ("if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt").

15

The remedy for ineffective assistance is one that attempts to restore "the defendant to the circumstance that would have existed had there been no constitutional error." United States v. Carmichael, 216 F.3d 224 (2d Cir. 2000). Finally, the preferred method for adjudicating such claims is, as here, via a habeas petition filed with the District Court. See United States v. Kehdr, 343 F.3d 96, 99-100 (2d Cir. 2003); United States v. Williams, 205 F.3d 23, 35 (2d Cir. 2000); see also United States v. Salameh, 152 F.3d 88 (2d Cir. 1998).

ii.    **The Failure to Investigate and Call Alibi Witnesses**

It is beyond cavil that effective assistance requires counsel to make a reasonable investigation of the facts of a given case, or a reasonable decision that makes particular investigation unnecessary. See, e.g., Strickland, 466 U.S. at 690-91; Lindstadt v. Keane, 239 F.3d 191, 200 (2d Cir. 2001). Though matters of strategy "made after thorough investigation of ... [the] facts ... are virtually unchallengeable," (Strickland, 466 U.S. at 690) deficient performance due to "ignorance, inattention or ineptitude[]" calls for a different result. See Cox v. Donnelly, 387 F.3d 193, 201 (2d Cir. 2004). Here, trial counsel made no attempt to investigate the possibility of an alibi defense after the exact date of Mr. DiMattina's supposed extortion became known, and as such, was both objectively unreasonable and prejudicially deficient. Simply put, there cannot be any logical reason for counsel to have purposefully failed to investigate this defense once the date of the extortion became known.

Where ineffective assistance claims are predicated on the failure to call witnesses, the Court of Appeals describes two elements which should be fulfilled. First, the petitioner must provide the specific names of the witnesses not called and detailed descriptions of the testimony they would have provided if they had testified. See United States v. Green, 104 F.3d 354, 1996

16

WL 665719, at *3 (2d. Cir. November 14, 1996) (a defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to demonstrate prejudice); <u>Jones v. Smith</u>, No. 09 Cv. 6497, 2011 WL 7794174, at *8 (S.D.N.Y. November 4, 2011) (same); <u>Wright v. Conway</u>, Nos. 09 Cv. 2967, 08 Cv. 1426, 2009 WL 3273901, at *12 (E.D.N.Y. October 9, 2009) (Bianco, J.) (affidavit from uncalled witness necessary to demonstrate prejudice resulting from trial attorney's deficient performance).  Mr. DiMattina's petition clearly satisfies this hurdle.

Second, the proffered testimony of suggested defense witnesses must have been helpful to the defense at trial.  <u>United States v. Vargas</u>, 920 F.2d 167 (2d Cir. 1990) (no ineffective assistance found where proffered testimony of suggested defense witnesses related only to collateral matters; there was no indication that this evidence would have been helpful to the defendant), <u>cert. denied</u>, 502 U.S. 826 (1991); <u>Farr v. Greiner</u>, No. 01 Cv. 6921, 2007 WL 1094160, at *32 (E.D.N.Y. April 10, 2007) (Gershon, J.) (Petitioner failed to describe how interviewing potential witnesses would have aided his defense).  Clearly, no type of witnesses could be more significant and helpful than alibi witnesses which place the defendant in *another state* at the time he was supposedly threatening an individual with a weapon.

***

The sheer number of witnesses that have been located and could have been interviewed and called on behalf of Mr. DiMattina is staggering: 12 individuals have filed affidavits together with either this petition or his March 16, 2012 Rule 33 Motion which place him in a different state at the time of the alleged extortionate act.  Six additional witnesses were present at the scene and did not witness Mr. DiMattina at that location.  These witnesses would have provided powerful alibi testimony that struck at the heart of the government's case.  Instead, the jury was

17

left uninformed due to trial counsel's failure to investigate these witnesses – or even request an adjournment during the trial to look into their existence once the date of the underlying extortionate act became known.  For these reasons, trial counsel's failure to investigate and call the aforementioned witnesses was unreasonable, ineffective and caused Mr. DiMattina's unreliable convictions.

## CONCLUSION

For the foregoing reasons, petitioner Frank DiMattina's motion for a Writ of Habeas

Corpus pursuant to Title 28 U.S.C. § 2255 should be granted in its entirety.

Dated:      New York, New York
            March 11, 2013

                                        Respectfully submitted,


                                        **LAW OFFICES OF JEFFREY LICHTMAN**


                                        _____
                                        **JEFFREY LICHTMAN, ESQ. (JL6328)**
                                        750 Lexington Ave., Fl. 15
                                        New York, NY 10022
                                        Ph: (212) 581-1001
                                        Fax: (212) 581-4999
                                        jhl@jeffreylichtman.com

                                        *Attorney for Petitioner Frank DiMattina*